[No. 83728-7. En Banc.]
Argued October 28, 2010. Decided July 7, 2011.

KATHLEEN HARDEE, *Petitioner*, v. THE DEPARTMENT OF SOCIAL
AND HEALTH SERVICES, *Respondent*.

2

*Philip A. Talmadge* and *Sidney C. Tribe* (of *Talmadge/Fitzpatrick*) and *Carol Farr* (of *The Law Offices of Leonard W. Moen & Associates*), for petitioner.

*Robert M. McKenna, Attorney General, Jay D. Geck, Deputy Solicitor General,* and *Patricia L. Allen, Assistant,* for respondent.

*Joan K. Mell* on behalf of Service Employees International and Childcare Advocate Resource & Education, amici curiae.

*Alberto D. Casas, Joy Ann Logan Van Wahlde,* and *Millicent D. Newhouse* on behalf of Northwest Justice Project, amicus curiae.

*Sarah A. Dunne, Nancy L. Talner, Lenora M. Lapidus, Ariela M. Migdal,* and *Risha K. Foulkes* on behalf of American Civil Liberties Union and National Employment Law Project, amici curiae.

*John W. Schedler* on behalf of Washington State Veterinary Medical Association, amicus curiae.

---

¶1 J.M. JOHNSON, J. — A statute provides that the State's decision to revoke a home child care license should be upheld if it is supported at an evidentiary hearing by a preponderance of the evidence. In *Ongom v. Department of Health*, 159 Wn.2d 132, 134, 148 P.3d 1029 (2006), we held that due process requires the State to support a decision to revoke a nursing assistant's registration under the higher standard of clear and convincing evidence. The question in this case is whether constitutional requirements of due process require the State to support its decision to revoke a home child care license by the higher standard of clear and convincing evidence. We hold that it does not and overrule our decision in *Ongom*.

¶2 The Department of Early Learning[1] (Department) revoked Kathleen Hardee's license to operate her home child care business. Hardee requested an administrative hearing, and the hearing officer rescinded the Department's revocation. A review judge reversed the hearing officer and issued an order revoking Hardee's license. In her order, the review judge determined that the Department proved its case against Hardee by a preponderance of the evidence. The superior court and the Court of Appeals affirmed the order. Hardee argues that constitutional due process requires the Department to prove its case by clear and convincing evidence and that the review judge did not properly defer to the hearing officer's findings of fact.

---

[1] Prior to July 2006, the Department of Social and Health Services regulated child care agencies. *Hardee v. Dep't of Soc. & Health Servs.*, 152 Wn. App. 48, 51 n.1, 215 P.3d 214 (2009).

¶3 We affirm the Court of Appeals and hold that, at an administrative hearing, constitutional due process requires no more than a preponderance of the evidence to justify the revocation of a home child care license. In doing so, we overrule our previous decision in *Ongom*. We further hold that the review judge gave appropriate deference to the hearing officer's findings of fact and that the equal access to justice act (EAJA), RCW 4.84.350, does not entitle Hardee to attorney fees.

FACTS AND PROCEDURAL HISTORY

¶4 Hardee worked as a licensed home child care provider for 22 years. Sometime in the year 2000, the Department grew concerned with the actions of Hardee's teenage son, William, who lived in her home.[2] In 2001, concerns regarding William culminated when he received a juvenile conviction for harassment, intimidation of a student, and fourth degree assault for threatening a person at school with a knife. Because of William's disqualifying criminal conviction, the Department initiated an action to revoke Hardee's home child care license but ultimately abandoned the action because William left the home.[3] William returned to the home in 2003 under a safety plan that prohibited him from having unsupervised access to child care children. Throughout 2004-2005, Hardee requested two similar waivers to allow William to remain at her house, despite his disqualifying conviction.

¶5 In July 2006, the Department received a report from the King County Sheriff's Office. King County reported that William, then 19 years old, sexually assaulted a three

---

[2] The Department received allegations of aggressive behavior by William, including physical altercations with his mother, threatening to bring an AK-47 rifle to school, making a blow torch using hair spray and a lighter, threatening teachers, animal abuse, pointing an air gun at a young child's head, and showing a child how to start a fire using an aerosol can.

[3] William was sent to the Martin Center in Bellingham, Washington, from June 11, 2002, until the end of March 2003.

year old child that he babysat. The child victim did not attend Hardee's child care, and the sexual assault did not occur during child care hours. However, the incident occurred in Hardee's home.[4] King County charged William with first degree rape of a child. William pleaded guilty of first degree child molestation and was incarcerated.

¶6 In response to King County's 2006 referral, the Department suspended Hardee's license and initiated an investigation. The Department concluded that Hardee violated conditions of the 2003 safety plan and subsequent waivers. The investigation revealed allegations that William had unsupervised access to children in Hardee's child care business.[5] The investigation also led to allegations that Hardee failed to report other individuals who lived in her home who had not received mandatory criminal background checks and that Hardee provided child care after her 2006 suspension. The Department revoked Hardee's license on the basis of its investigative findings.

¶7 Hardee requested an administrative hearing to challenge the license revocation. An administrative law judge (ALJ) conducted the hearing, rendered factual findings, concluded that the revocation was unwarranted, and rescinded the license revocation. A review judge disagreed with the ALJ, issuing a final order containing revised factual findings and revoking Hardee's child care license.[6] The review judge denied Hardee's petition for reconsideration. Hardee petitioned the superior court for review of the decision and order. The superior court affirmed. On appeal,

---

[4] The Court of Appeals mistakenly concluded, contrary to the testimony taken at Hardee's administrative hearing, that the sexual assault did not occur in Hardee's home.

[5] Specifically, one parent stated that he walked into Hardee's home and saw William changing his two year old daughter's diaper. Another parent alleged that Hardee left William at the home with the children while she ran errands.

[6] The review judge found that William had unsupervised access to children in violation of the 2003 safety agreement and 2004 waiver. She also determined that Hardee allowed unidentified people to be present in her home during child care hours of operation. The review judge concluded that Hardee lacked the personal characteristics necessary to provide child care.

the Court of Appeals affirmed the superior court. *Hardee v. Dep't of Soc. & Health Servs.*, 152 Wn. App. 48, 63, 215 P.3d 214 (2009). Hardee then successfully petitioned this court for review. *Hardee v. Dep't of Soc. & Health Servs.*, 168 Wn.2d 1006, 226 P.3d 781 (2010).

ANALYSIS

¶8 Hardee argues that constitutional due process requires the Department to justify its revocation of her home child care license by clear and convincing evidence, that the review judge failed to give proper deference to the ALJ's factual findings, and that she is entitled to attorney fees under the EAJA. We disagree. We hold that, at an administrative hearing to revoke a home child care license, the requirement that the Department justify its revocation by a preponderance of the evidence satisfies due process. We expressly overrule *Ongom*. We further hold that the review judge gave appropriate deference to the ALJ's findings of fact, and that the EAJA does not entitle Hardee to attorney fees.

## A. Standard of Review

¶9 The Administrative Procedure Act (APA) governs judicial review of administrative agency decisions. RCW 34.05.510; *see also Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993). The party challenging an agency decision has the burden of demonstrating the invalidity of the agency's action. RCW 34.05.570(1); *see also Thurston County v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 164 Wn.2d 329, 341, 190 P.3d 38 (2008). The APA provides nine bases on which to challenge an agency decision, two of which involve instances where "[t]he order, or the statute or rule on which the order is based, is in violation of constitutional provisions on its face or as applied" and where "[t]he order is not supported by evidence that is substantial when viewed in light of the whole record before the court." RCW 34.05.570(3)(a), (e); *see also Thurston County*, 164 Wn.2d at

341. When reviewing an administrative agency decision, we stand in the same position as the superior court. *Thurston County*, 164 Wn.2d at 341. Whether an agency order, or the statute supporting the order, violates constitutional provisions is a question of law and "[w]e review issues of law de novo." *Id.*; *Amunrud v. Bd. of Appeals*, 158 Wn.2d 208, 215, 143 P.3d 571 (2006). An agency order is supported by substantial evidence if there is " 'a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.' " *Thurston County*, 164 Wn.2d at 341 (internal quotation marks omitted) (quoting *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998)).

## B. Administrative Proceedings and the Burden of Proof

¶10 The statute governing Hardee's administrative hearing requires a preponderance of the evidence to uphold the Department's action. The statutory authority governing the Department's licensing procedures may be found in chapter 43.215 RCW. It provides that, at an administrative hearing, the ALJ shall uphold the Department's decision to revoke a home child care license if a preponderance of the evidence supports the decision. RCW 43.215.300(2). Hardee challenged the Department's revocation decision at an administrative hearing. According to the legislature, the preponderance of the evidence standard was the proper evidentiary burden to place on the Department.

¶11 Hardee argues that constitutional due process requires a clear and convincing evidentiary standard.[7] "The function of a standard of proof . . . is to 'instruct the

---

[7] Hardee raises her due process claims under both the Fourteenth Amendment, section 1 of the United States Constitution, and article I, section 3 of the Washington Constitution. Generally, due process challenges to a Washington statute do not require separate analyses under the state and federal constitutions. *See State v. Manussier*, 129 Wn.2d 652, 679, 921 P.2d 473 (1996). Hardee does not argue that the state constitution provides greater due process protections, nor does she provide analysis of the factors set forth in *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986); *see In re Pers. Restraint of Grasso*, 151 Wn.2d 1, 18 n.12, 84 P.3d 859 (2004) (citing *State v. Smith*, 148 Wn.2d 122, 131, 59 P.3d 74 (2002)).

factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' " *Addington v. Texas*, 441 U.S. 418, 423, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979) (quoting *In re Winship*, 397 U.S. 358, 370, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) (Harlan, J., concurring)). The significance of the private interest at stake directly corresponds to the rigor of the burden placed on the State. Rights that touch on fundamental areas of human concern require the State to justify its action by clear and convincing evidence. *See Addington*, 441 U.S. at 432-33 (holding that due process requires a clear and convincing evidentiary standard at a proceeding to involuntarily commit an individual to a state mental hospital); *Santosky v. Kramer*, 455 U.S. 745, 768, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (holding that due process requires a clear and convincing evidentiary standard at a proceeding to terminate parental rights). Rights of lesser significance do not require the State to satisfy a burden beyond the preponderance of the evidence standard. *See Rivera v. Minnich*, 483 U.S. 574, 575, 107 S. Ct. 3001, 97 L. Ed. 2d 473 (1987) (holding that, in an action to compel child support, due process does not require a burden beyond a preponderance of the evidence standard to prove paternity); *Vance v. Terrazas*, 444 U.S. 252, 266, 100 S. Ct. 540, 62 L. Ed. 2d 461 (1980) (holding that due process does not require a burden beyond a preponderance of the evidence standard at an expatriation proceeding); *see also Steadman v. Sec. & Exch. Comm'n*, 450 U.S. 91, 104, 101 S. Ct. 999, 67 L. Ed. 2d 69 (1981) (noting that constitutional due process does not prohibit Congress from adopting the preponderance of the evidence standard to determine whether an individual violated antifraud provisions of federal securities law).

¶12 A professional license is a property interest for which revocation requires due process. *Haley v. Med. Dis-*

For these reasons we conduct our due process analysis solely under the federal constitution.

*ciplinary'Bd.*, 117 Wn.2d 720, 732, 818 P.2d 1062 (1991); *see also Bang D. Nguyen v. Dep't of Health*, 144 Wn.2d 516, 518, 29 P.3d 689 (2001) (holding that a medical license constitutes a property interest and that due process requires clear and convincing evidence before revocation). However, not all occupations require an identical personal investment and not all state-granted credentials constitute a *professional* license.

¶13 In light of our decisions in *Nguyen* and *Ongom*, the Court of Appeals has struggled to determine which evidentiary standard should apply to administrative hearings that affect an individual's ability to engage in her occupation of choice. *Compare Eidson v. Dep't of Licensing*, 108 Wn. App. 712, 32 P.3d 1039 (2001) (holding that the preponderance standard applies to a real estate agent), *and Kabbae v. Dep't of Soc. & Health Servs.*, 144 Wn. App. 432, 192 P.3d 903 (2008) (holding that the preponderance standard applies to an adult-home caregiver), *and Brunson v. Pierce County*, 149 Wn. App. 855, 205 P.3d 963 (2009) (holding that the preponderance standard applies to exotic dancers), *and Kraft v. Dep't of Soc. & Health Servs.*, 145 Wn. App. 708, 187 P.3d 798 (2008) (holding that the preponderance standard applies to a program manager at an adult home), *and Islam v. Dep't of Early Learning*, 157 Wn. App. 600, 238 P.3d 74 (2010) (holding that the preponderance standard applies to a home child care provider), *with Chandler v. Office of Ins. Comm'r*, 141 Wn. App. 639, 173 P.3d 275 (2007) (holding that the clear and convincing standard applies to an insurance agent), *and Nims v. Bd. of Registration for Prof'l Eng'rs & Land Surveyors*, 113 Wn. App. 499, 53 P.3d 52 (2002) (holding that the clear and convincing standard applies to a licensed engineer).

### 1. *The* Mathews[8] *Test*

¶14 To determine whether the legislative standards for an adjudicative proceeding satisfy constitutional due process requirements, we consider three factors:

"First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Post v. City of Tacoma*, 167 Wn.2d 300, 313, 217 P.3d 1179 (2009) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)). Applying the *Mathews* factors, the preponderance of the evidence standard promulgated by the legislature satisfies due process at an administrative proceeding to revoke a home child care license.

### i. First *Mathews* Factor—Private Interest

¶15 Providing care to children is an enormous responsibility and an occupation that merits great societal respect. However, a license for a home child care facility is not a personal interest that compels a standard of proof beyond a preponderance of the evidence. A license to operate a home child care business adheres to the facility and not the individual provider. WAC 170-296-0020 (defining "family home child care" as a "facility licensed to provide direct care" to children). Unlike a professional license, the Department can revoke a home child care license for the misconduct of a resident other than the provider. WAC 170-296--0210, -0215. A provider can obtain a license for a home by completing a mere 20 hours of state approved training. WAC 170-296-1410(5)(d). Further, an individual who

---

[8] *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

wishes to care for children but who lacks the requisite qualifications to obtain a license can still potentially work in the field as a child care staff member. WAC 170-296- -1410(6) (defining the less stringent requirements for "child care staff"). Someone who loses her license but continues to feel a vocational calling to provide child care can still work in the field under the supervision of another licensed child care provider.

  ii. Second *Mathews* Factor—Risk of Erroneous Deprivation and Value of Additional Procedural Safeguards

¶16 It is unlikely that requiring the additional procedural safeguard of a different evidentiary standard is necessary to curtail erroneous deprivations of home child care licenses. Adjudicative proceedings already exist that afford significant procedural safeguards to a home child care provider. At an administrative hearing, a home child care provider benefits from an unbiased tribunal, notice of the proposed action and the grounds asserted for it, an opportunity to present reasons why the proposed action should not be taken, the right to call witnesses, the right to know the evidence against her, the right to have a decision based only on the evidence presented, the right to counsel, the making of a record of the proceedings, public attendance of the proceedings, and judicial review of the proceedings. *See generally* RCW 34.05.410-.598 (establishing applicable procedures for administrative proceedings and judicial review of such proceedings); *see also* Harry J. Friendly, *Some Kind of Hearing*, 123 U. Pa. L. Rev. 1267, 1279-95 (1975) (discussing the elements of a fair hearing). While additional procedural safeguards will always decrease the likelihood of revocation, that fact alone does not justify their adoption. Rather, the current procedures must suffer from inadequacies that make erroneous deprivations readily foreseeable. The current procedural protections in place sufficiently protect against erroneous deprivations.

### iii. Third *Mathews* Factor—Government Interest

¶17 The State's interest in protecting children from the threat of physical and sexual abuse is paramount. The legislature expressly states that "[t]o safeguard and promote the health, safety, and well-being of children receiving child care and early learning assistance . . . is paramount over the right of any person to provide care." RCW 43.215.005(4)(c). Though our inquiry concerning the State's interests does not defer to legislative proclamations, statutory aims and objectives serve as strong independent evidence of a public good's value. The State holds the highest interest in the protection of children. In fulfilling its obligation to protect children, the State must be able to regulate the providers and facilities to which we entrust their care. A requirement that the Department perfect its case to a quasi-criminal standard of proof could endanger children and ignores the reality and the responsibility of the State to protect its most innocent and vulnerable residents.

### 2. *The* Nguyen *Decision*

¶18 Hardee argues that our decisions in *Nguyen* and *Ongom* compel a different result. *Nguyen* is unlike the present case and does not stand for the general proposition that the State's revocation of any occupational credential requires clear and convincing evidence.[9] *Nguyen* specifically addresses the unique context of a medical doctor's property interest in his license to practice medicine. *Nguyen*, 144 Wn.2d at 522 ("At its heart this case concerns the process due an accused physician by the state before it may deprive him his interest in property and liberty represented by his professional license.").

---

[9] Our decision in *Nguyen* is not without its critics. *See Nguyen*, 144 Wn.2d at 534-55 (Ireland, J., dissenting); *Ongom*, 159 Wn.2d at 151-57 (Owens, J., dissenting); *see also N.D. State Bd. of Med. Exam'rs v. Hsu*, 2007 ND 9, 726 N.W.2d 216, 228-30; *In re Miller*, 2009 VT 112, 186 Vt. 505, 989 A.2d 982, 992; *Granek v. Tex. State Bd. of Med. Exam'rs*, 172 S.W.3d 761, 771 (Tex. App. 2005); *Uckun v. Minn. State Bd. of Med. Practice*, 733 N.W.2d 778, 785 (Minn. App. 2007).

¶19 Disciplinary proceedings against physicians affect a greater property interest than that of a home child care provider despite the great respect we owe the latter. Physicians hold a unique role in our society. Historically, they belonged to one of the three paradigmatic professions: law, medicine, and pastoral ministry. *See* SAMUEL HABER, THE QUEST FOR AUTHORITY AND HONOR IN THE AMERICAN PROFESSIONS, 1750-1900, at 4-5 (1991); *see also* Nathan O. Hatch, *Introduction: The Professions in a Democratic Culture, in* THE PROFESSIONS IN AMERICAN HISTORY 3 (Nathan O. Hatch ed., 1988); WILLIAM M. SULLIVAN, WORK AND INTEGRITY: THE CRISIS AND PROMISE OF PROFESSIONALISM IN AMERICA 2 (1995). Becoming a licensed physician requires a four year undergraduate degree, a four year postgraduate degree, and additional years of residency training. Physicians must pass multiple tests and examinations before licensure and maintain continuing educational requirements thereafter. A physician's license is not limited to a particular location. Once licensed, a physician may engage in his or her craft anywhere within the jurisdiction that issued the license. The physician holds the medical license—not the facility in which the physician administers care. Because the license is held by the individual, a disciplinary board cannot predicate a revocation of the license on the misconduct of other individuals. Upon revocation of the license, a physician can no longer engage in the practice of medicine. The physician cannot administer medical care under the guise of being a lesser type of medical provider. The unique education, investment, and personal attachment of a physician's license indicates that the physician holds a greater property interest in the license than that of a home child care provider in the provider's state-granted credential. Our decision in *Nguyen* is distinct from the facts presented by Hardee's case.

3. *The* Ongom *Decision*

¶20 *Ongom* presented a more difficult case. The license at issue in *Ongom* lacked many of the characteristics

traditionally associated with the historical professions and the licensee had a personal interest in her certification lesser than that held by a physician in his or her medical license. *See Ongom*, 159 Wn.2d at 157-58 (Owens, J., dissenting). Despite Ongom's more limited property interest, we held that her disciplinary proceedings required application of the clear and convincing standard. *Id.* at 142. We based this holding on the premise that Ongom's case was indistinguishable from *Nguyen. Id.* ("In sum, this case is on all fours with *Nguyen* . . . .").

¶21 To arrive at this holding, we applied the "generalized considerations set forth in" *Mathews. Id.* at 138. Applying the first *Mathews* factor, we rejected the argument that we could distinguish *Nguyen* on the basis of the personal interest at stake. *Id.* We said:

> Although undoubtedly a medical license is much more difficult to obtain than a registration to practice as a nursing assistant . . . [w]e cannot say Ms. Ongom's interest in earning a living as a nursing assistant is any less valuable to her than Dr. Nguyen's interest in pursuing his career as a medical doctor.

*Id.*

¶22 Looking to the second *Mathews* factor, we rejected the argument that we could distinguish *Nguyen* on the basis of the additional procedural protections afforded to Ongom under the APA. *Id.* at 140. We said that "[w]hile there are certainly some differences in the facts and procedures at issue . . . these differences do not justify a distinction in the eyes of the law and . . . the potential risk of error is not appreciably different." *Id.*

¶23 Lastly, in light of the third *Mathews* factor, we rejected the argument that we could distinguish *Nguyen* on the basis of the nature of the governmental interest. *Id.* at 141-42. Determining that the inquiry is not about the "ultimate governmental interest which justifies the licensing scheme in the first place," we said, " '[T]his requirement relates to practical and financial burdens to be imposed upon

the government were it to adopt a possible substitute procedure for the one currently employed.' " *Id.* at 141 (quoting *Nguyen*, 144 Wn.2d at 532). Moreover, we concluded that the clear and convincing standard promoted the government's primary interest in accurate proceedings. *Id.* at 142.

¶24 Upon careful reconsideration of its reasoning and effects, we now overrule *Ongom*. "[O]verruling prior precedent should not be taken lightly." *Lunsford v. Saberhagen Holdings, Inc.*, 166 Wn.2d 264, 278, 208 P.3d 1092 (2009). We will not overrule a precedent unless there is " 'a clear showing that an established rule is incorrect and harmful.' " *Id.* at 280 (internal quotation marks omitted) (quoting *Riehl v. Foodmaker, Inc.*, 152 Wn.2d 138, 147, 94 P.3d 930 (2004)). *Ongom* is both incorrect and harmful precedent; therefore, it is overruled.

¶25 *Ongom* is incorrect because of its flawed application of the *Mathews* factors. First, *Ongom* confused the *interest* at stake in a disciplinary proceeding with Ongom's subjective *desire* to engage in her occupation. For purposes of the *Mathews* analysis, the personal interest at stake in a proceeding is the property interest (i.e., the license) and not one's subjective desire to perform work in the job of one's choosing. To determine the value of this property interest, a court must look to objective measures of investment (e.g., time, money, education, etc.) rather than engaging in the hopeless task of weighing the subjective value each individual places on his or her chosen occupation. *See Mathews*, 424 U.S. at 340-43 (applying objective measures to distinguish the value of the welfare benefits at stake in *Goldberg v. Kelly*, 397 U.S. 254, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970), from the value of the disability benefits at stake in *Mathews* and holding that only the former requires an evidentiary hearing before adverse administrative action).

¶26 A license is an endorsement that lends credibility and esteem to an individual. It is a benefit granted by the State and it encourages third parties to believe that the State sanctions and positively evaluates the work of the

license holder. In the present case, the Department's revocation of Hardee's license is not an absolute prohibition that terminates her right to provide child care of any sort. Rather, the revocation is a withdrawal of the State's endorsement and certificate of approval.

¶27 *Ongom* incorrectly applied the first *Mathews* factor when it mistakenly focused on Ongom's desire to work as a nurse compared to Nguyen's desire to practice medicine. *See Ongom*, 159 Wn.2d at 138. This is not the proper inquiry. The proper inquiry should focus on objective measures to determine the value of the property interest that the State seeks to take away—i.e., the license. It is therefore relevant to consider the time, expense, and education invested to obtain the license. This is not some sort of elitist value judgment.[10] It is simply one realistic measure of the property interest at stake in an administrative proceeding.

¶28 Second, *Ongom* failed to apply the second *Mathews* factor. *Ongom* failed to apply the second *Mathews* factor because it determined, without explanation, that Ongom's procedural protections under the APA were sufficiently similar to Nguyen's. *Id.* at 140. This too is incorrect. The adequacy of procedural protections is context dependent. *Compare Mathews*, 424 U.S. at 349 (not requiring an evidentiary hearing for revocation of disability benefits), *with Goldberg*, 397 U.S. at 260-61 (requiring evidentiary hearing for revocation of welfare benefits). *Ongom*, however, failed to address the adequacy of the procedural protections afforded to Ongom in her particular context. This inquiry is essential to the second *Mathews* factor that requires us to evaluate not only the risk of erroneous deprivation, but also "the probable value, *if any*, of addi-

---

[10] There is no identifiable correspondence between the financial and property interests associated with an occupation and the societal value of an occupation. The disparity in salaries between a kindergarten teacher and a professional basketball player or between a social worker and a famous stand-up comedian cannot be interpreted as measuring their contributions to society. The disparity in salary is a product of the market. It does not support judgments regarding the relative worth of these occupations.

tional or substitute procedural safeguards . . . ." *Mathews,* 424 U.S. at 335 (emphasis added).

¶29 Third, *Ongom* misapplied the third *Mathews* factor. Describing the government interest factor, *Ongom* incorrectly stated that " 'this requirement relates to practical and financial burdens to be imposed upon the government were it to adopt a possible substitute procedure for the one currently employed.' " *Ongom,* 159 Wn.2d at 141 (quoting *Nguyen,* 144 Wn.2d at 532). *Ongom*'s reliance on *Nguyen*'s dicta is misplaced. *Mathews* did not limit the government's interest to its interest in maintaining current procedural protections vis-a-vis providing additional procedural protections. While the governmental interest *includes* the financial and administrative burdens of providing additional procedural protections, its interest is not *limited to* such considerations. *See Mathews,* 424 U.S. at 335 (describing the third factor as "the Government's interest, *including* the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail" (emphasis added)).

¶30 Because of its misapplication of the *Mathews* factors, *Ongom* was incorrect. The decision is also harmful. As the United States Supreme Court noted in *Mathews:*

> [T]he Government's interest, and hence that of the public, in conserving scarce fiscal and administrative resources is a factor that must be weighed. At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost.

*Id.* at 348. Due to the scarcity of resources, a decision that requires the State to direct more time and money toward administrative hearings can ultimately harm the very individuals the administrative proceeding was designed to protect. *See id.* ("[T]he cost of protecting those whom the preliminary administrative process has identified as likely to be found undeserving may in the end come out of the

pockets of the deserving since resources available for any particular program of social welfare are not unlimited.").

¶31 The present case illustrates the harmful consequences of *Ongom*'s reasoning. Like other sexual assaults, the sexual abuse of children almost always occurs in private. The perpetrator typically selects the victim on the basis of the child's vulnerability, vulnerability that often includes the child's inability to report the abuse and a lack of physical evidence. This is most aggravated when the victim is a young child or an infant. The circumstances surrounding the crime make it, in most instances, extremely difficult to prove. This is true even for criminal prosecutors supported by experienced detectives and a professional police force.

¶32 Despite these inherent evidentiary hurdles, *Ongom* would compel the Department to use its limited resources to satisfy a quasicriminal standard of proof before revoking its endorsement of a child care facility—even when a preponderance of the evidence indicates that the children in the facility were exposed to potential sexual abuse. This requirement is potentially very harmful and is not constitutionally mandated.

■ ¶33 Because it is both incorrect and harmful, *Ongom* is overruled. We hold that, at an administrative hearing to revoke a home child care license, the statutory requirement that the Department justify its revocation by a preponderance of the evidence satisfies constitutional due process. Our decision in *Nguyen* does not control because, unlike the present case, it involved an individual's unique property interest in a *professional* license. Our decision in *Ongom* is overruled.

## C. Deference of the Review Judge to the ALJ

¶34 When reviewing the factual findings and conclusions of an ALJ,

"The reviewing officer shall exercise all the decision-making power that the reviewing officer would have had to decide and

enter the final order had the reviewing officer presided over the hearing . . . . In reviewing findings of fact by presiding officers, the reviewing officers shall give due regard to the presiding officer's opportunity to observe the witnesses."

*Tapper*, 122 Wn.2d at 404 (emphasis omitted) (quoting RCW 34.05.464(4)); *see also* WAC 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 (providing the Department's own definition of the review judge's authority). Regardless of whether "[i]t would perhaps be more consistent with traditional modes of review for courts to defer to factual findings made by an officer who actually presided over a hearing," the legislature chose otherwise. *Tapper*, 122 Wn.2d at 405. "[I]t is not our role to substitute our judgment for that of the Legislature." *Id.* at 406. The findings of fact relevant on appeal are the reviewing officer's findings of fact—even those that replace the ALJ's. *Id.* Here, the review judge meticulously reviewed the evidence, as well as the ALJ's factual findings, and appropriately substituted her own findings when warranted.[11]

¶35 Hardee argues that the review judge inappropriately replaced the ALJ's factual findings. According to Hardee, allowing the review judge to replace the ALJ's factual findings renders the ALJ "superfluous." She urges us to adopt the reasoning in *Costanich v. Department of Social & Health Services*, 138 Wn. App. 547, 554-56, 156

---

[11] The review judge did not replace any express credibility determinations made by the ALJ. For this reason, this case does not require us to determine the appropriate level of deference that a review judge owes the ALJ's credibility determinations. As we noted in *Tapper*:

> Some federal courts have suggested that where the reviewing officer ignores or reverses the credibility findings of the hearing officer, heightened scrutiny should apply to substantial evidence review of any substituted findings of fact. Given the particular solicitude of RCW 34.05.464(4) for the credibility findings of the hearing officer, some such rule would seem to be warranted. However, since this is not a substantial evidence case, we do not address the question of what such a rule would look like.

*Tapper*, 122 Wn.2d at 405 n.3 (citation omitted). Unlike *Tapper*, this case involves substantial evidence review. However, due to the lack of express credibility determinations, we do not consider what level of deference a review officer owes the ALJ's credibility determinations. *See* RCW 34.05.461(3) ("Any findings based substantially on credibility of evidence or demeanor of witnesses shall be so identified.").

P.3d 232 (2007), *rev'd on other grounds*, 164 Wn.2d 925, 194 P.3d 988 (2008).

¶36 Hardee's arguments are not persuasive. First, the statute and our case law do not render the ALJ superfluous. Even where the review judge replaces the ALJ's factual findings, the ALJ still plays a crucial role in affording the licensee an opportunity to be heard, providing notice of the evidence against the licensee, and making a record of the proceedings. Second, *Costanich* is both nonbinding authority and distinguishable. *Costanich* involved interpretation of an administrative regulation distinct from the statutory provision at issue in the case at bar. *See Costanich*, 138 Wn. App. at 554-55. Lastly, the legislature empowered the review judge with the lawful authority to replace the ALJ's factual findings. Even if we agreed with Hardee's reasoning, "it is not our role to substitute our judgment for that of the Legislature." *Tapper*, 122 Wn.2d at 406. We hold that the review judge gave the ALJ's findings of fact appropriate deference.

¶37 Further, we hold that substantial evidence supports the review judge's factual findings. The review judge concluded that the Department proved that Hardee violated the terms of her 2003 safety agreement and 2004 waiver by allowing William to have unsupervised access to a child under her care and that she lacked the personal characteristics an individual needs to provide child care. Substantial evidence supports these conclusions. Parental declarations and testimonial evidence from the hearing supported the review judge's determination that William had unsupervised access to young children in violation of the 2003 safety agreement and subsequent waiver. Although the review judge relied on some hearsay evidence, reliance on hearsay is permissible. RCW 34.05.452(1).

¶38 The review judge determined that Hardee lacked the personal characteristics to provide child care. She based this determination on Hardee's poor judgment in allowing William unsupervised access to child care children and

Hardee's decision to allow other adults to have access to the children during child care hours.[12] Ample evidence supported these determinations.

## D. Attorney Fees

¶39 Under the EAJA,

> [e]xcept as otherwise specifically provided by statute, a court shall award a qualified party that *prevails in a judicial review of an agency action* fees and other expenses, including reasonable attorneys' fees, unless the court finds that the agency action was substantially justified or that circumstances make an award unjust.

RCW 4.84.350(1) (emphasis added). Here, Hardee did not prevail in judicial review of the Department's action and she is not entitled to attorney fees.

CONCLUSION

¶40 We hold that, at an administrative hearing to revoke a home child care license, the statutory requirement that the Department justify its revocation by a preponderance of the evidence satisfies constitutional due process. In doing so, we overrule our previous decision in *Ongom*. We further hold that the review judge gave appropriate deference to the ALJ's findings of fact and that the EAJA does not entitle Hardee to attorney fees. We affirm the Court of Appeals and the decision to revoke Hardee's license.

ALEXANDER, CHAMBERS, and OWENS, JJ., concur.

---

[12] The review judge also determined that Hardee exercised poor judgment in allowing William supervised access to child care children. This determination is incorrect. Hardee received a waiver from the Department allowing William to have supervised access to child care children. The Department cannot predicate its revocation of Hardee's license based upon her decision to allow William supervised access when the Department acquiesced to this arrangement. However, the evidence of William's unsupervised access in violation of the safety plan and waivers is sufficient to warrant the review judge's conclusion. Therefore, there is still substantial evidence to support the review judge's order.

¶41 MADSEN, C.J. (concurring) — I concur in the result reached by the lead opinion. The majority in *Ongom v. Department of Health*, 159 Wn.2d 132, 148 P.3d 1029 (2006), incorrectly determined that due process requires proof by clear, cogent, and convincing evidence when the State seeks to revoke an occupational license. *Id.* at 144-49 (Madsen, J., dissenting). I agree that it must be overruled.

¶42 But *Ongom* rested on *Bang D. Nguyen v. Department of Health*, 144 Wn.2d 516, 29 P.3d 689 (2001), which was also incorrectly decided. However, instead of overruling *Nguyen*, the lead opinion distinguishes it on the basis that the license at issue in *Nguyen* was a *professional* license. Lead opinion at 18. This distinction finds no support in our precedent or that of the United States Supreme Court. It will have the unfortunate effect of turning the selection of standards of proof for licensure deprivations into ad hoc, occupation-specific value judgments about the nature of the private interest at stake. Rather than adopting an unjustifiable distinction to preserve an incorrectly decided case, we should overrule *Nguyen* as well.

## ANALYSIS

¶43 The legislature has found that the State's interest in protecting the health and welfare of children is "paramount over the right of any person to provide care" to children. RCW 43.215.005(4)(c). The legislature has also determined that in proceedings in which the State seeks to deprive a person of a license to provide child care, the applicable standard of proof is the preponderance of the evidence standard. RCW 43.215.300(2). Using this standard, the Department of Early Learning revoked Kathleen Hardee's license to provide child care, finding that she had violated the conditions for maintaining her certification. The review judge, the superior court, and the Court of Appeals all found revocation well supported by the record. *Hardee v. Dep't of Soc. & Health Servs.*, 152 Wn. App. 48, 51, 215 P.3d 214

(2009). Nonetheless, Ms. Hardee claims that revoking her license on the basis of proof by a preponderance of the evidence denies her due process of law. Citing *Ongom* and *Nguyen*, she argues that she is entitled to proof by clear, cogent, and convincing evidence.

¶44 The preponderance standard traditionally applies in licensure revocation proceedings regardless of the occupation at issue. *Ongom*, 159 Wn.2d at 155 n.15 (Owens, J., dissenting) (citing numerous cases to this effect from other states, including *Granek v. Tex. State Bd. of Med. Exam'rs*, 172 S.W.3d 761 (Tex. App. 2005) (ophthalmologist's medical license); *Parrish v. Ky. Bd. of Med. Licensure*, 145 S.W.3d 401 (Ky. Ct. App. 2004) (radiologist's medical license); *Snyder v. Colo. Podiatry Bd.*, 100 P.3d 496 (Colo. Ct. App. 2004) (podiatrist's medical license); *In re Smith*, 169 Vt. 162, 730 A.2d 605 (1999) (nursing license); *Ga. Bd. of Dentistry v. Pence*, 223 Ga. App. 603, 478 S.E.2d 437 (1996) (dentistry license); *In re Petition of Grimm*, 138 N.H. 42, 635 A.2d 456 (1993) (psychologist's license); *Pickett v. Utah Dep't of Commerce*, 858 P.2d 187 (Utah Ct. App. 1993) (pharmacist's license); *Boswell v. Iowa Bd. of Veterinary Med.*, 477 N.W.2d 366 (Iowa 1991) (veterinarian's license)). This is true because while citizens have "some generalized due process right to choose one's field of private employment," the right of all citizens to pursue a particular occupation has always been limited, subject to "reasonable government regulation." *Conn v. Gabbert*, 526 U.S. 286, 291-92, 119 S. Ct. 1292, 143 L. Ed. 2d 399 (1999) (citing *Dent v. West Virginia*, 129 U.S. 114, 9 S. Ct. 231, 32 L. Ed. 623 (1889)). Consistent with the limited nature of the right, a person's interest in pursuing a particular profession is unlike the "particularly important" interests that are "more substantial than mere loss of money," which require proof by clear, cogent, and convincing evidence before someone can be deprived of them. *Addington v. Texas*, 441 U.S. 418,

424, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979).[13] We recognized this principle in the context of a challenge to the State's revocation of a taxicab driver's license when we held that "while it is clear that pursuing a lawful private profession or occupation is a protected right under the state and federal constitutions, it is equally clear that such right is not a fundamental right, requiring heightened judicial scrutiny." *Amunrud v. Bd. of Appeals*, 158 Wn.2d 208, 222, 143 P.3d 571 (2006). While *Amunrud* presented a substantive due process challenge, it nevertheless demonstrates the limited nature of the private interest one possesses in pursuing an occupation for purposes of procedural due process. *Ongom*, 159 Wn.2d at 146 (Madsen, J., concurring in dissent).

¶45 Absent "countervailing constitutional constraints," the United States Supreme Court has found a preponderance of the evidence to be sufficient in proceedings to revoke an occupational license. *Steadman v. Sec. & Exch. Comm'n*, 450 U.S. 91, 95, 101 S. Ct. 999, 67 L. Ed. 2d 69 (1981) (requiring only preponderance to revoke a stockbroker's license).

¶46 Other jurisdictions agree that in the context of a license to practice medicine, the preponderance standard satisfies constitutional due process requirements. *See N.D. State Bd. of Med. Exam'rs v. Hsu*, 2007 ND 9, 726 N.W.2d 216, 230 ("Under the *Mathews* framework for analyzing due process claims, we conclude the preponderance of evidence standard satisfies due process" in disciplinary proceedings where a physician's interest in a medical license is at stake. *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).); *Anonymous (M-156-90) v. State Bd. of Med. Exam'rs*, 329 S.C. 371, 378, 496 S.E.2d 17 (1998) (same); *Gandhi v. State of Wis. Med. Examining Bd.*, 168 Wis. 2d 299, 304-07, 483

---

[13] These interests include parental rights (*see Santosky v. Kramer*, 455 U.S. 745, 756, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)); personal liberty (*see Addington*, 441 U.S. at 427); United States residency (*see Woodby v. Immigration & Naturalization Serv.*, 385 U.S. 276, 285, 87 S. Ct. 483, 17 L. Ed. 2d 362 (1966)); and citizenship (*see Chaunt v. United States*, 364 U.S. 350, 353, 81 S. Ct. 147, 5 L. Ed. 2d 120 (1960)).

N.W.2d 295 (1992) (same); *In re Revocation of License of Polk*, 90 N.J. 550, 560-69, 449 A.2d 7 (1982).

¶47 Although the United States Supreme Court has had occasion to consider a wide range of professions, it has never suggested that the nature of a profession affects the scope of the interest of those seeking to pursue it. *Cf. Barry v. Barchi*, 443 U.S. 55, 64, 99 S. Ct. 2642, 61 L. Ed. 2d 365 (1979) (protected interest in horse trainer's license); *Dent*, 129 U.S. at 121-22 (protected interest in medical license). To the contrary, the Court has indicated that "the liberty component of the Fourteenth Amendment's Due Process Clause includes *some generalized due process right* to choose one's field of private employment." *Conn*, 526 U.S. at 291-92 (emphasis added); *cf. Dent*, 129 U.S. at 121 (*"all* vocations are open to every one on like conditions [and] [*a*]*ll* may be pursued as sources of livelihood, some requiring years of study and great learning" (emphasis added)). The Court has never suggested that a professional licensee has a greater interest in retaining his or her certification than the holder of a nonprofessional licensee. Because the constitutional right to pursue any profession is the same, the nature of the license at issue does not affect the standard of proof necessary to satisfy due process when the state seeks to revoke the license.

¶48 Unfortunately, in attempting to distinguish *Nguyen*, the lead opinion makes this exact distinction. The lead opinion says that acquiring a license to practice medicine requires greater "education" and "investment" than a license to provide child care and that physicians have greater "personal attachment" to their licenses. Lead opinion at 13. Therefore, the lead opinion reasons that a physician has a greater interest in his or her medical license than a child care provider has in his or her license to provide child care. *Id.* at 18.

¶49 The lead opinion cites no authority for its assertion that a child care provider has less "attachment" to her license. But, even if a medical license does require greater

"investment" and carry greater "personal attachment" than a child care license, both licenses entitle a licensee only to pursue an occupation. *See id.* at 13. And neither occupation affects a fundamental constitutional liberty interest. To the extent the lead opinion holds otherwise, it is inconsistent with both *Amunrud* and *Steadman*.

¶50 Moreover, a rule that distinguishes between professional and nonprofessional licenses is untenable. Licenses come in many forms, all requiring different levels of "personal investment" and with differing levels of "personal attachment." Conferring greater due process protection on some licensees and not on others on the basis of the personal investment required for acquisition of the license creates an ad hoc analysis and unpredictable results. Is an engineer entitled to proof by clear, cogent, and convincing evidence before the Board of Registered Professional Engineers may deprive him or her an engineering license? *See Nims v. Bd. of Registration for Prof'l Eng'rs & Land Surveyors*, 113 Wn. App. 499, 53 P.3d 52 (2002). What about dental hygienists or cosmetologists, whose licenses require great personal investment? Do we classify them as professionals, to which a higher standard of proof applies, or do we somehow distinguish them from physicians, despite their personal investment in their licenses? *See* RCW 18.29.021; RCW 18.16.060. A license may be every bit as necessary and important to the individual who needs it to engage in long-haul trucking as it is to one who needs it to practice law or medicine. The lead opinion acknowledges that our courts are struggling to articulate consistent standards of proof for the administrative revocation of licenses across a wide range of occupations. Lead opinion at 8. Far from providing helpful clarification, however, the lead opinion fails to offer any clear guidance for determining the standard of proof that will be required. Moreover, it fails to provide a valid basis for concluding that different standards should apply in the first place.

¶51 The lead opinion's attempt to distinguish *Nguyen* rather than overrule it makes no sense. First, in *Nguyen*,

the court overestimated the private interest at stake, given the limited nature of the right to pursue the particular profession. *Ongom*, 159 Wn.2d at 147-48 (Madsen, J., concurring in dissent). This mistake undermined our application of the *Mathews* test, since we expressly recognized the private interest as our "primary concern" and as the "most important[ ]" factor. *Nguyen*, 144 Wn.2d at 526, 523. Second, the court undervalued the weight of the governmental interest in protecting the public. The governmental interest, when considered in the balance, should have been given more weight than the license holder's individual interest. *Ongom*, 159 Wn.2d at 148 (Madsen, J., concurring in dissent). Distinguishing *Nguyen* rather than overruling it invites courts to make the same mistakes based on the characteristics of the particular occupation at issue. This is not what due process requires, nor is it fair to those whose careers require licenses that a court may not designate as "professional."

## CONCLUSION

¶52 Like *Ongom*, *Nguyen* was wrongly decided. Rather than adopting an unjustifiable distinction to save *Nguyen*, we should overrule it as well. Nevertheless, because the lead opinion finds that RCW 43.215.300(2) does not violate Ms. Hardee's due process rights, I concur in the result.

C. JOHNSON, FAIRHURST, and STEPHENS, JJ., concur with MADSEN, C.J.

¶53 SANDERS, J.[*] (dissenting) — Our decision in *Nguyen v. Department of Health*, 144 Wn.2d 516, 29 P.3d 689 (2001), holding that procedural due process requires clear and convincing evidence before the state can revoke a profes-

---

[*] Justice Richard Sanders is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).

sional license, controls in this case. Because the lead opinion declines to follow this holding and unnecessarily overrules our decision in *Ongom v. Department of Health*, 159 Wn.2d 132, 148 P.3d 1029 (2006), I dissent.

## I. This case is governed by *Nguyen*

¶54 In *Nguyen* we held that constitutional due process requires proof by clear and convincing evidence in a medical disciplinary proceeding before a doctor may be deprived of a medical license. 144 Wn.2d at 518. Our holding in *Nguyen* is applicable to the loss of any professional license, and a distinction based on the time and expense of obtaining a medical license relative to the lesser commitment of resources necessary to obtain another professional license is elitist and irrelevant.

¶55 While "[a]t its heart" *Nguyen* concerns a physician's license, *id.* at 522, the principles of due process upon which it relies apply to all professional licenses. Due process principles recognize that "[t]he more important the interest" at issue, "the less tolerant we are as a civilized society that it be erroneously deprived." *Id.* at 524. The nature and importance of the interest subject to a potentially erroneous deprivation determines the minimum standard of proof required by constitutional due process. *Id.* Where the interest is a monetary dispute between private parties, a preponderance of the evidence standard satisfies due process. *Id.* (citing *Addington v. Texas*, 441 U.S. 418, 423, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979)). Where the interest is a potentially erroneous criminal conviction, due process requires proof beyond a reasonable doubt. *Id.* An intermediate standard of proof is appropriate "in circumstances where the interest is greater than a mere money judgment but less than a generic criminal proceeding." *Id.* at 525.

¶56 The clear and convincing proof standard, an intermediate standard between preponderance of the evidence and beyond a reasonable doubt, is warranted in this case because Hardee's interest in her home child care license is

"greater than a mere money judgment but less than a general criminal proceeding." *Id.* What we said of Dr. Nguyen, that "[h]is professional license, his reputation, his ability to earn a living for his family are very important interests—much more important than money alone," *id.* at 526, is also very true of Kathleen Hardee.

¶57 The lead opinion distinguishes *Nguyen* on the basis of the relative time and expense necessary to obtain a medical license and on the basis of a physician's membership in a "paradigmatic" profession. Lead opinion at 13. The lead opinion claims a doctor's "unique education, investment, and personal attachment" to his medical license give the doctor a "greater property interest" in that license than Hardee has in her professional license. *Id.* Hardee was a licensed home child care provider for 22 years. To obtain a home child care license, a licensee must complete at least 20 hours of training, complete college credits in child education or development, or obtain an associate or higher college degree in child education or development. WAC 170-296- -1410(5)(d)(i)-(iii). A licensee must maintain current CPR (cardiopulmonary resuscitation) and first aid training, pay an annual license fee, and apply to renew the license every three years. WAC 170-296-0160, -0170, -0260. To obtain and maintain her home child care license for 22 years, Hardee made unique investments in terms of training and finances. These investments are not lessened because another professional made relatively larger investments.

¶58 Hardee's chosen profession should also not be slighted because other professions have been recognized for a longer time. *See* lead opinion at 13. Physicians' "unique role in our society," *id.* at 13, does not lessen the unique role of a child care provider who acts as a surrogate parent for much of the day. We require specific and valued personal characteristics of the individuals to whom we entrust our children. A home child care licensee must have "[a]n understanding of how children develop socially, emotionally, physically, and intellectually"; care for children on the basis

of "an understanding of each child's interests, life experiences, strengths, and needs"; and be reliable, dependable, truthful, and ethical. WAC 170-296-0140(1)(a), (b).[14] That society does not honor these characteristics as highly as the time and money necessary to obtain a physician's license is not a reason to afford a lesser level of protection to the child care licensee.

¶59 Under the lead opinion's analysis, should a physician who paid for his education through scholarships be protected against revocation by only a preponderance standard because he has made a lesser financial investment in obtaining his license? Should a physician who received a medical degree in another country that requires fewer years of specialized education be protected by the less stringent standard because he made a lesser investment in time? By distinguishing *Nguyen* and limiting its applicability to a physician's license because of the physician's significant investment in time and money, the lead opinion forces courts to define the value of a profession before deciding which standard of evidence applies to a revocation of a professional license.

II.    The *Mathews* test

¶60 We follow the test set out in *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), to determine whether a procedure to deprive an individual of

---

[14] These required personal characteristics belie the lead opinion's implication that Hardee's home child care license did not attach to her personally. *See* lead opinion at 13. The review judge recognized that personal characteristics, and not merely the facility in which Hardee maintained her child care business, determined Hardee's eligibility to obtain and keep her license. In her determination that Hardee's license should be revoked, the review judge determined Hardee lacked the personal characteristics to provide child care. Similarly, in the letter to Hardee revoking her license, the Department of Social and Health Services stated, "You lack the good character and judgment to continue to operate a day care facility." Clerk's Papers (CP) at 13. Surely once her license was revoked, Hardee could not move across the street and operate a facility out of another house. The revocation was based on her "personal characteristics," and any distinction based on a doctor's "personal attachment" to his medical license is inaccurate and misleading.

a property right satisfies constitutional due process requirements. We consider three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335. To determine that a preponderance standard satisfies due process under the *Mathews* test, the lead opinion discounts Ms. Hardee's private interest, focuses on irrelevant procedural safeguards, and disregards the negligible increase in cost to the government posed by a heightened standard of proof. The *Mathews* test demands a clear and convincing evidence standard for Hardee.

A.   Hardee's private interest

¶61 The lead opinion states, "[A] license for a home child care facility is not a personal interest that compels a standard of proof beyond a mere preponderance of the evidence." Lead opinion at 10. In an attempt to distinguish the loss of a child care license from the loss of a "professional license," the lead opinion claims, "Someone who loses her license but continues to feel a vocational calling to provide child care can still work in the field under the supervision of another licensed child care provider." *Id.* at 11.

¶62 This is an incomplete analysis of Hardee's private interest for two reasons. First, this disregards the very reasons someone might wish to open a home child care center. Without her own license, Ms. Hardee loses the convenience, flexibility, and economic gain that come from operating a small business out of her home. The lead opinion ignores these consequences of Hardee's license revocation, but rather suggests she seek work as a "child care staff member." *Id.*

¶63 Second, the lead opinion ignores the stigma Hardee faces as a former home child care licensee. If Hardee does maintain a "vocational calling to provide child care," *id.*, she faces the stigma of a license revocation on any employment background check or résumé. License revocations are publicly recorded on the State's licensed child care information system, searchable by the public. *See* WASH. STATE DEP'T OF EARLY LEARNING, CHILD CARE CHECK, *available at* https:// apps.del.wa.gov/check/checksearch.aspx (last visited June 30, 2011). Further, while the lead opinion suggests a license revocation will not prevent Hardee from following her "vocational calling" to provide child care, lead opinion at 11, a license revocation is a "negative action" that may cause the former licensee to be disqualified from providing licensed or unlicensed child care in the future. WAC 170-06- -0020(9), -0070. Hardee has an important private interest in her home child care license.

B. The risk of erroneous deprivation and the probable value of additional procedural safeguards

¶64 In *Nguyen* we considered whether the presence of extensive procedural safeguards at the original administrative hearing created an acceptable risk of erroneous deprivation under the second *Mathews* factor. 144 Wn.2d at 530. Our conclusion in *Nguyen* directly applies to the case presently before us:

> The problem with this approach . . . is that none of these procedural safeguards can substitute for, nor is even relevant to, failure to impose the requisite minimum burden of proof which is specifically designed "to impress the factfinder with the importance of the decision" and thereby reduce the chance of error.

*Id.* (quoting *Addington*, 441 U.S. at 427). Judicial review and appellate review cannot cure an inadequate standard of proof. *Id.* The lead opinion names the procedural safeguards available to home child care providers at an administrative hearing, which we found irrelevant in *Nguyen*, but

does not explain how these can remedy an inadequate standard of proof.[15]

## C. The State's interest

¶65 Finally, the lead opinion inaccurately accounts for the government's interest under the *Mathews* test. Again, our decision in *Nguyen* governs our consideration of this factor where we stated, "[T]his requirement relates to practical and financial burdens to be imposed upon the government were it to adopt a possible substitute procedure for the one currently employed." *Id.* at 532. In this case, as in *Nguyen*, no substitute procedure would be required— only a heightened standard of proof within the existing procedure. Because "[a]n increased burden of proof would not have the slightest fiscal impact upon the state, . . . [i]ncreased cost is clearly not a fact or concern here." *Id.*

¶66 Rather than consider the nonexistence of any additional financial burden on the government resulting from a higher standard of proof, the lead opinion notes the government's recognized interest in protecting children. Lead opinion at 12. I do not dispute the State's paramount duty to promote the health and well-being of children, but the third *Mathews* factor "does not relate to the interest which the government attempts to vindicate through the procedure" in question. *Nguyen*, 144 Wn.2d at 532. Contrary to the lead opinion's analysis, the *Mathews* test considers the government's interest in efficient and economically practical hearing procedures. Because a clear and convincing standard of proof would not pose additional financial burdens, the State's interest under *Mathews* is negligible.

---

[15] Considering the second *Mathews* factor, in *Nguyen* we also found a subjective standard of conduct increased the risk of erroneous deprivation and bolstered the need for a higher standard of proof. "[A]n elevated standard of proof militates against the possibility that the fact finder might deprive an individual of his license based solely on a few isolated incidents of unusual conduct." 144 Wn.2d at 531. The events giving rise to Hardee's license revocation proceedings were not typical of her 22 year career. The administrative law judge, concluding that the evidence did not support the allegation that Hardee allowed William unsupervised access to the child care children, called the events giving rise to the allegation a "single episode." CP at 28.

¶67 As Hardee has a significant private interest, the risk of erroneous deprivation under an inadequate standard of proof is high, and the State's interest in the additional burdens of imposing a higher standard of proof is low, *Mathews* dictates that the proper standard of proof is clear and convincing evidence.

### III. The State did not show by clear and convincing evidence that Hardee's license should be revoked

¶68 Because I would hold that the State must prove a violation warranting license revocation by clear and convincing evidence, I would also hold the State failed to meet its burden against Hardee. The administrative law judge (ALJ), the independent fact-finder who observed the witnesses at Hardee's license revocation hearing, found that no substantial evidence in the record supported the Department of Social and Health Services' action against Hardee's license. The ALJ observed and accepted the testimony of witnesses who attested to Hardee's fitness as a child care provider. The ALJ found nothing in the evidence to support the allegation that Hardee allowed her teenage son William unsupervised contact with the children in her care. Given the evidence, it was "clear" that during the incident in which William allegedly changed a child's diaper, Hardee was within view or hearing of William at all times. Clerk's Papers at 28. The ALJ also found no support for the allegation that another person resided at Hardee's residence in violation of her license agreement. The ALJ found, on the basis of the evidence presented at the license revocation proceeding, that Hardee's license should not have been revoked. The State's evidence against Hardee did not meet the clear and convincing standard of proof.

### IV. This court should not overrule *Ongom*

¶69 "[O]verruling . . . precedent should not be taken lightly." *Lunsford v. Saberhagen Holdings, Inc.*, 166 Wn.2d 264, 278, 208 P.3d 1092 (2009). "The doctrine of stare decisis

'requires a clear showing that an established rule is incorrect and harmful before it is abandoned.' " *Riehl v. Foodmaker, Inc.*, 152 Wn.2d 138, 147, 94 P.3d 930 (2004) (quoting *In re Rights to Waters of Stranger Creek*, 77 Wn.2d 649, 653, 466 P.2d 508 (1970)). Thus, our first question should be whether the rule stated in *Ongom*, that revocation of a professional license requires clear and convincing evidence, is incorrect. Clearly, because the rule stated in *Ongom* is the same rule established by *Nguyen* (a case the lead opinion does not overrule), *Ongom* is not incorrect.

¶70 Nor is the rule stated in *Ongom* harmful. The lead opinion states, "Due to the scarcity of resources, a decision that requires the State to direct more time and money toward administrative hearings can ultimately harm the very individuals the administrative proceeding was designed to protect." Lead opinion at 17.[16] But the lead opinion fails to consider that due process protections provided during license revocation hearings also protect the license holder who stands to lose her livelihood. Thus, while the lead opinion acknowledges the burden of meeting a "quasicriminal standard of proof," *id*. at 18, the lead opinion ignores the quasicriminal nature of a revocation proceed-

---

[16] For this proposition, the lead opinion cites *Mathews*, where " '[t]he cost of protecting those whom the preliminary administrative process has identified as likely to be found undeserving may in the end come out of the pockets of the deserving since resources available for any particular program of social welfare are not unlimited.' " Lead opinion at 17-18 (quoting *Mathews*, 424 U.S. at 348).

*Mathews*, of course, addressed the revocation of Social Security disability benefits—requiring the government to provide higher protection at a revocation hearing, thereby making it more likely a possibly undeserving petitioner would keep his benefits, reducing the funds available to deserving beneficiaries. *See Mathews*, 424 U.S. at 348 ("Significantly, the cost of protecting those whom the preliminary administrative process has identified as likely to be found undeserving may in the end come out of the pockets of the deserving since resources available for any particular program of social welfare are not unlimited."). The same is not true in the case of professional licenses. Requiring a higher standard of proof to a professional license-holder, thereby making it more likely a licensee would keep her respective professional license, will not reduce the amount of professional licenses available for other licensees or applicants.

ing[17] and the consequences for the individual who loses her license—certainly a harm to the individual whose alleged violation must be proved by only a preponderance or just more likely than not. The lead opinion has found *Ongom* worthy of overruling only by ignoring the harm to license holders.

V.   Attorney fees under the equal access to justice act

¶71 Because I would hold that Hardee prevailed in a judicial review of the Department's action, I would also hold she is entitled to attorney fees. *See* RCW 4.84.350(1).

¶72 I dissent.

Reconsideration denied September 30, 2011.

---

[17] *Wash. Med. Disciplinary Bd. v. Johnston*, 99 Wn.2d 466, 474, 663 P.2d 457 (1983) ("A professional license revocation proceeding has been determined to be 'quasi-criminal' in nature.").